

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | No. 1:18-CV-00675-LY |
| ex rel. AJIT PAI, Chair, | § | |
| FEDERAL COMMUNICATIONS | § | |
| COMMISSION (FCC), | § | NO CONSENT TO ARBITRATION |
| a public, charitable trust, and | § | |
| a non-beneficiary, | § | |
| | § | |
| Plaintiff, | § | NO CONSENT TO NON- |
| | § | JUDICIAL DECISION-MAKING |
| v. | § | INCLUDING MAGISTRATE |
| | § | PARTICIPATION |
| WALTER OLENICK, and | § | |
| M. RAE NADLER-OLENICK, | § | |
| non-fiduciaries, | § | |
| | § | |
| Respondents. | § | |

## RESPONDENTS' RULE 12 MOTIONS

COME NOW WALTER OLENICK and M. RAE NADLER-OLENICK, husband
and wife, THE OLENICKS, Respondents, who move as follows:

### Rule 12 Motions

THE OLENICKS move for dismissal.  Plaintiff lacks both standing and
capacity, and THE OLENICKS are not liable in the capacity sued. RULES 12(b)(1)
and (b)(2). Plaintiff has also failed to state a claim for which relief may be granted.
RULE 12(b)(6). And, Plaintiff has failed to join indispensable parties. RULE 12(b)(7).

### Motion regarding length

Should this document exceed length restrictions, THE OLENICKS request

**No commercial nexus**

leniency.  This combination of motions is presented as concisely as the circumstances allow. This defense is not "first impression," but it's still "new," necessitating extended analysis. The change in judicial personnel warrants coverage of the history, which history confirms the defense(s).

**Discussion**

Plaintiff's most fundamental problem.

Plaintiff has refused (and refused and refused) to recognize the *indispensable* nature of the condition precedent of consent. In fact, Plaintiff has gone so far as to confess, judicially, by asserting that they [1] just don't *need* it, Doc [1] p.7 ¶¶ 22-23, that they don't *have* any evidence of consent.

Given Plaintiff's judicial confession in their *pleading* that they have no evidence establishing that THE OLENICKS consented to being regulated, there is no need to go beyond the pleadings to address Plaintiff's jurisdictional failure(s).  In short, this *entire* case turns on this basic question – How do we ***know*** that Plaintiff must prove consent?  THE OLENICKS address it at length, as well as the additional points.

THE OLENICKS are the land owners, thus the building and (antenna) tower owners.  The FCC's mission doesn't extend to land, building, or tower ownership. In sum, Plaintiff has *never* had any competent claim against THE OLENICKS.

---

[1] Where the antecedent is "USOA," pronoun use is inconsistent; sometimes singular; sometimes, as here, plural.

**No commercial nexus**

## Table of Contents

RESPONDENTS' RULE 12 MOTIONS.................................................................1

   Rule 12 Motions .................................................................................1

   Motion regarding length................................................................1

   Discussion...........................................................................................2

      Plaintiff's most fundamental problem. ...........................2

Table of Contents ......................................................................................3

Table of Authorities..................................................................................6

   Discussion (cont'd)............................................................................12

      RULES involved............................................................................12

   Consent – the generic legal mechanism of agencies – an intro. ........12

   The FCC's method for seducing consent – an overview. ...................13

   The nature of the seduced consent – an intro. .................................13

   Legal context and setting – the details...........................................14

      The FCC's indispensable condition precedent of a viable commercial nexus...........................................................................14

      The condition precedent of consent is indispensable.............................15

      A.   The analogy to "transportation" matters – semantics and consent.15

      B.   Independently from the fact that "communications" and "transportation" enforcement both implement Sixth Plank policy, how do we *know* that the FCC has to have, allege, prove up, the condition precedent of consent?............................................................18

         1.   Regs don't function by any other legal mechanism. ...................18

         2.   What type of claim may be both "civil" and "quasi-criminal" simultaneously?...........................................................................19

         3.   Conversely, what type of claim is popularly "criminal" but actually "civil" in nature?............................................................21

**No commercial nexus**

What is the nature of the commercial nexus on which the FCC depends:  contract or trust?................................................24

What is the general rule that ties all these sorts of matters together?25

Is Title 47, as applied, "constitutional?" ................................................26

What are the components of a viable FCC trust?..................................27

A.   Fiduciary – the "target(s)." ................................................27

B.   Beneficiary – the FCC. ................................................27

C.   Trust *res* – the <u>frequency</u>.................................................27

Example Rule 12 application in context. ................................................29

How does the FCC try to seduce the "target" into a commercial nexus?30

Relevant 90.1 FM litigation history – this very court already declared who owned 90.1 FM (prior to the Calvary Chapel "take over"). ....................34

The governing legal principle:  Co-trustees are indispensable parties.34

Review of the foregoing.........................................................................34

Foundational hypothetical for Rule 12(b)(7)..........................................35

The original, judicially-declared list of owners didn't include THE OLENICKS. ................................................36

A.   The original 90.1 FM NAL matter(s). ................................................36

B.   The judicially declared ownership continued right up until the Calvary Chapel "take over." ................................................38

C.   The two sides of the same "absent party" coin. ................................................39

1.  Were indispensable co-trustees absent in 2010 [?] … ................39

2.  … or are indispensable co-trustees absent now [2018]?............40

a.  Failure to exhaust "administrative process." ........................41

b.  Statute of limitations.................................................43

D.   Sheriff Frank succumbed to one or more of the "gotcha" mechanisms. THE OLENICKS haven't. .................................................45

This matter – USOA's (FCC's) judicial confession of "no commercial nexus." ....................................................................................46

RULE 12(b)(1). .................................................................................48

Rule 8 – collateral estoppel (issue preclusion). ............................48

Rule 8 – res judicata (claim preclusion). ......................................52

Rule 8 – statute of frauds............................................................55

No Standing -- No commercial nexus. .........................................55

RULE 12(b)(2). .................................................................................58

Rules 9 and 17 – capacity.............................................................59

RULE 12(b)(6). .................................................................................59

RULE 12(b)(7). .................................................................................60

In conclusion, here are the relevant, superior, operating, uncontested facts. 62

Request for Relief...............................................................................64

§ 1746 Declaration – WALTER OLENICK .....................................65

§ 1746 Declaration – M. RAE NADLER-OLENICK .......................65

CERTIFICATE OF SERVICE..............................................................66

# Table of Authorities

**Cases**

*United States v. **Any and All Radio** Transmission Equipment,*
204 F.3d 658 (6th Cir. 2000)............................................................................19, 22

*Arnold v. United States,*
544 U.S. 1058, 125 S. Ct. 2527 (Mem), 161 L. Ed. 2d 1107, 73 U.S.L.W. 3623, 73
U.S.L.W. 3690, 73 U.S.L.W. 3693, 2005 Daily J. D.A.R. 6241 (May 31, 2005)......57

*Bailey v. Alabama,*
219 U.S. 219, 31 S. Ct. 145, 55 L. Ed. 191 (1910)....................................................25

*Ballard v. Comm'r,*
544 U.S. 40, 125 S. Ct. 1270, 161 L. Ed. 2d 227 (2005)...........................................56

*Bates v. State Bar of Arizona,*
433 U.S. 350, 97 S. Ct. 2691, 53 L. Ed. 2d 810 (1977)............................................57

*United States v. **Berheide**,*
421 F.3d 538, 540 (7th Cir. 2005)...........................................................................25

*United States v. **Booker**,*
543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005)...........................................57

*Brown v. Oaklawn Bank,*
718 S.W.2d 678 (Tex. 1986)..................................................................................24

*Burger King Corp. v. Rudzewicz,*
471 U.S. 462, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)...........................................56

*City of Laredo v. Laredo Merchants Assn.,*
__ S.W.3d __, 2018 WL 3078112 (Tex. June 22, 2018) (No. 16-0748)......................24

*City of Salt Lake City v. Hollister,*
118 U.S. 256, 6 S. Ct. 1055, 30 L. Ed. 176  (1886)...................................................19

*Cleveland Bd. of Educ. v. LaFleur,*
414 U.S. 632, 94 S. Ct. 791, 39 L. Ed. 2d 52 (1974)................................................58

*Conley v. Gibson,*
355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)...............................................14, 56

*Lujan v. **Defenders of Wildlife**,*
504 U.S. 555, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)....................................15, 55

*Elkins v. Moreno,*
    435 U.S. 647, 98 S. Ct. 1338, 55 L. Ed. 2d 614 (1978)................................................58

*Escobedo v. Illinois,*
    378 U.S. 478, 84 S. Ct. 1758, 12 L. Ed. 2d 977 (1964)..............................................57

*Felter v. Southern Pacific Co.,*
    359 U.S. 326, 79 S. Ct. 847, 3 L. Ed. 2d 854 (1959).................................................57

*BATF v. **Galioto**,*
    477 U.S. 556, 106 S. Ct. 2683, 91 L. Ed. 2d 459 (1986)............................................58

*District of Columbia v. **Heller**,*
    554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008).........................................56

*Horne v. Dep't of Agric.,*
    __ U.S. __, 135 S. Ct. 2419, 192 L. Ed. 2d 388 (2015)..............................................56

*Hotel Markham, Inc., v. Ball,*
    131 F.2d 424 (5th Cir. 1942)......................................................34, 38, 39, 44

*Humes-Pollett v. Family Health Ctr., Inc.,*
    339 Fed. Appx. 490 (5th Cir. 2009) ................................................................59

*In re Limbaugh,*
    155 B.R. 952 (Bankr. N.D. Tex. 1993)...........................................................50

*Ashcroft v. **Iqbal**,*
    556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)..................................14, 56

*Lozman v. Riviera Beach,*
    568 U.S. 115, 133 S. Ct. 735, 184 L. Ed. 2d 604 (2013)..................16, 17, 56, 57, 64

*Matter of Gober,*
    100 F.3d 1195, 1208 (5th Cir. 1996).............................................................48

*Minnick v. Mississippi,*
    498 U.S. 146, 156, 111 S. Ct. 486, 492, 112 L. Ed. 2d 489 (1990) (Scalia, J, and
    Rehnquist, C.J. Dissent)...........................................................................58

*Miranda v. Arizona,*
    384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)..............................................57

*National Federation of Independent Business v. Sebelius,*
    567 U.S. 519, 132 S. Ct. 2566, 183 L. Ed. 2d 450 (2012) (***NFIB***). ...........................56

**No commercial nexus**

*Nolana Dev. Ass'n v. Corsi*,
    682 S.W.2d 246 (Tex. 1984)..................................................................56

*Ohralik v. Ohio State Bar Assn.*,
    436 U.S. 447, 98 S. Ct. 1912, 56 L. Ed. 2d 444 (1978)............................57

Perkins v. State,
    No. 15-0594 (Tex. Sept. 25, 2015) ("Perkins I") (**Denied**, not DWOJ)..................24

Perkins v. State,
    No. 16-0247 (Tex. May 13, 2016) ("Perkins II") (**Denied**, not DWOJ)..................24

Perkins v. State,
    No. 16-0782 (Tex. Jan. 20, 2017) ("Perkins III") (DWOJ) (for want of > $250
    amount in controversy) ("fine" amount in judgment is $0).....................24

*Pollock v. Farmers' Loan & Trust Co.*,
    157 U.S. 429, 15 S. Ct. 673, 39 L.Ed. 759 (1895) (***Pollock I***)................57

*Pollock v. Farmers' Loan and Trust Co.*,
    158 U.S. 601, 15 S. Ct. 912, 39 L. Ed. 1108 (1895) (***Pollock II***)...........57

*United States v. Priv. Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*,
    44 F.3d 1082, 1085 (2d Cir. 1995) (Heaney, Senior Cir. J., dissenting)...............20

*Pulitzer-Polster v. Pulitzer*,
    784 F.2d 1305 (5th Cir. 1986)...............................................34, 38, 39, 44

*Robertson v. Carson*,
    86 U.S. 94, 19 Wall. 94, 22 L. Ed. 178 (1873)..........................34, 38, 39, 44

*Rosenthal & Co. v. Commodity Futures Trading Commn.*,
    802 F.2d 963 (7th Cir. 1986)................................................................20

*United States v. **Rust Communications Group**, Inc.*,
    425 F. Supp. 1029 (E.D. Va. 1976)........................................................19

*Weinberger v. **Salfi***,
    422 U.S. 749, 95 S. Ct. 2457, 45 L.Ed.2d 522 (1975)............................58

*Snow Ingredients, Inc. v. SnoWizard, Inc.*,
    833 F.3d 512, 521 (5th Cir. 2016)........................................................52

*Stanley v. Illinois*,
    405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)............................58

*State Farm Fire and Cas. Co. v. Fullerton,*
    118 F.3d 374 (5th Cir. 1997)...........................................................................51

*Stevens v. State,*
    No. 16-0248 (Tex. Jun. 24, 2016) (**Denied**, not DWOJ).........................24

*Swaim v. Moltan Co.,*
    73 F.3d 711 (7th Cir. 1996)...........................................................................59

*Toll v. Moreno,*
    458 U.S. 1, 102 S. Ct. 2977, 73 L. Ed. 2d 563 (1982)...............................58

*Tremont LLC v. Halliburton Energy Services, Inc.,*
    696 F. Supp. 2d 741 (S.D. Tex. 2010)...................................................50, 51

*Bell Atl. Corp. v. **Twombly**,*
    550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)...................14, 56

*Vlandis v. Kline,*
    412 U.S. 441, 93 S. Ct. 2230, 37 L. Ed. 2d 63 (1973)...............................58

*Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,*
    489 U.S. 468, 109 S. Ct. 1248, 103 L. Ed. 2d 488 (1989)..........................31

*Warshaw v. Local No. 415, Int'l Ladies' Garment Workers' Union AFL-CIO,*
    325 F.2d 143 (5th Cir. 1963).........................................................34, 38, 39, 44

## Statutes

28 U.S.C.A. §§ 636(a), (c)..................................................................................56

TEX. FIN. CODE § 392.301(a). ............................................................................24

TEX. PENAL CODE § 32.43. ...........................................................................14, 25

TEX. PROP. CODE ANN. § 112.004 ......................................................................55

TEX. TRANSP. CODE ANN. § 24.013(f)(2) (West 1999 & Supp. 2006) (operate / aircraft). .............................................................................................................16

TEX. TRANSP. CODE ANN. § 501.002(17) (motor vehicle). .................................16

TEX. TRANSP. CODE ANN. § 502.001(25) (motor vehicle). .................................16

RULE 12 Motions (THE OLENICKS)                                                                 9
**No commercial nexus**

TEX. TRANSP. CODE ANN. § 522.003(11) (drive). ..........................................................16

TEX. TRANSP. CODE ANN. § 522.003(21) (motor vehicle). ............................................16

TEX. TRANSP. CODE ANN. § 541.001(1) (operator / vehicle). ........................................16

TEX. TRANSP. CODE ANN. § 541.201(11) (motor vehicle). ............................................16

TEX. TRANSP. CODE ANN. § 601.002(5) (motor vehicle). ..............................................16

TEX. TRANSP. CODE ANN. § 601.002(8) (operator / motor vehicle). ............................16

TEX. TRANSP. CODE ANN. § 642.001(1) (motor vehicle). ..............................................16

TEX. TRANSP. CODE ANN. § 642.001(2) (operator / motor vehicle). ............................16

TEX. TRANSP. CODE ANN. § 647.001(4) (motor vehicle). ..............................................16

TEX. TRANSP. CODE ANN. § 647.001(5) (operator / motor vehicle). ............................16

TEX. TRANSP. CODE ANN. § 683.001(4) (motor vehicle). ..............................................16

TEX. TRANSP. CODE ANN. § 724.001(11) (operate / motor vehicle). ............................16

TEX. TRANSP. CODE ANN. § 728.001(2) (motor vehicle). ..............................................16

**Rules of Procedure**

FED. R. CIV. P. 8. ..........................................................................................................12

FED. R. CIV. P. 8(c). .....................................................................................................56

FED. R. CIV. P. 9. ..........................................................................................................12

FED. R. CIV. P. 12. ........................................................................................................12

FED. R. CIV. P. 12(b)(1).................................................................1, 15, 17, 29, 30, 35

FED. R. CIV. P. 12(b)(2).................................................................1, 30, 35, 48, 55, 58

FED. R. CIV. P. 12(b)(6).........................................................................1, 29, 30, 35, 59

FED. R. CIV. P. 12(b)(7).........................................................1, 34, 35, 36, 39, 53, 60

FED. R. CIV. P. 17. ...............................................................................12, 29, 30, 59

**No commercial nexus**

FED. R. CIV. P. 19. .............................................................................12, 30, 34, 39, 53

TEX. R. CIV. P. 94.................................................................................................56

**Treatises**

1 PAGE, THE LAW OF WILLS, §§ 5.7, 15.11 (rev. 2003). ..................................57

2A AUSTIN WAKEMAN SCOTT & WILLIAM FRANKLIN FLATCHER, SCOTT ON TRUSTS
    §§ 66, 74, 112 (4th ed. 1987) ("[Vol.] SCOTT ON TRUSTS § _").....................27

 AMY MORRIS HESS, GEORGE GLEASON BOGERT & GEORGE TAYLOR BOGERT, THE LAW
OF TRUSTS AND TRUSTEES § __ (Supp. 2011) ("BOGERT § _")
BOGERT § 42 (Supp. 2011). .............................................................................57

BOGERT § 44 (Supp. 2011). .............................................................................57

BOGERT § 50 (rev. 2d ed. 1984 & Supp. 2011). ..............................................55

BOGERT § 871 (repl. vol. for rev. 2d ed. 1995 & Supp. 2011). .......................56

**Web pages**

< **https://www.marxists.org**/archive/marx/works/1848/communist-
    manifesto/ch02.htm. >. .............................................................................15

**No commercial nexus**

**Discussion (cont'd)**

RULES involved.

This combined set of motions implements FED. RS. CIV. P. 8, 9, 12, 17, and 19. RULE 8 requires the assertion of particular affirmative defenses. RULE 9 requires addressing special matters, e.g., capacity. RULE 12 motions are required prior to the filing of a responsive pleading. RULE 17 addresses (lack of) capacity. And, RULE 19 addresses USOA's *manifest* inconsistency in selection of liable parties.

Consent – the generic legal mechanism of agencies – an intro.

Since regs are neither legislative work product nor tyrannical, czar-esque edicts, by what mechanism is such language "enforceable?"  Commercial consent.

To promulgate a reg is to propose a term to an agreement.  Nothing more.

The congress may create these various public charitable trusts, providing each with a mission (scope), offices, some procedures, and the like, but the congress can't, and therefore didn't, delegate legislative power.  Regs are not "evidence of law." Regs don't apply just because they exist. Regs apply if and only if they've been agreed to.  Thus, *all* regs-enforcing agencies depend 100% on a commercial nexus relevant to that agency.

To see this mechanism for the regs is to see the undergirding for *all* agency enforcement activity, generally – pick an agency.  That there are statutes that define various parts of an agency in no way alters the legal mechanism by which that agency obtains its "authority," which "authority" can't and doesn't extend beyond the "agreements" within that agency's mission or scope to enforce.

**No commercial nexus**

Key to *everything* about agencies is this:  Consent cannot be compelled.

### The FCC's method for seducing consent – an overview.

While the mechanism ("consent") is the same across the board, each agency has its own method for seducing that necessary consent.  Per agency, the more uniform in appearance that agency's process, the fewer the questions that come to mind by those actually doing the enforcing.  If those hired to do the enforcing actually understood they were doing "agreement management," not "law enforcement," not only might they look elsewhere for work but also they might get wise to this mechanism, generally, which would tend to expose the agency's entire system.  So, the commercial mechanism has to work while remaining totally and completely unknown not only to the super-vast majority of the officers, agents, and employees of that agency but also to the "target(s)" (*and* their attorneys).

The FCC's mainstay inducement technique is initiating the "administrative process."  When that technique works, the "target" is seduced into consenting to FCC-sponsored arbitration, thus into the necessary commercial nexus, generally.

### The nature of the seduced consent – an intro.

When formed, what is the nature of the "agreement?"  There are but two options: contract or trust.  Since FCC "forfeiture" claims are characterized as "quasi-criminal" (thus, for *any and all* agencies that initiate "(quasi-) criminal" proceedings), the commercial nexus sounds in trust.  How do we *know*?  Because nothing about breach of contract may legitimately in any way be characterized even

**No commercial nexus**

as "(quasi-) criminal," and it *is* possible for breach of trust to trigger "criminal" sanctions. *See, e.g.,* TEX. PENAL CODE § 32.43 (commercial bribery) (i.e., criminal breach of trust).

Key to the FCC's clandestinely induced trust "agreements" is the trust *res*. The property owned in trust to the benefit of the FCC is the **frequency**, itself.

Legal context and setting – the details.

Given (A) what USOA *alleges*, which is a series of legal conclusions (semantics) unsupported by *facts*, *cf. Twombly* (abrogating *Conley*) and *Iqbal*, 556 U.S. at 677–80 (applying *Twombly*) (allege *facts*, not legal conclusions), and (B) what USOA *fails to allege*, especially regarding the indispensable condition precedent of a viable commercial nexus, USOA confesses filing an intentionally frivolous suit to accomplish an ulterior motive.

### *The FCC's indispensable condition precedent of a viable commercial nexus.*

Regarding the indispensable condition precedent of a commercial nexus, there are three aspects to address: (1) "that" such condition precedent must exist; (2) the nature of the "agreement," and (e) "how" such "agreement" is formed (in the FCC context).

**No commercial nexus**

### THE CONDITION PRECEDENT OF CONSENT IS INDISPENSABLE.

The FCC is a public charitable trust that exists to do "agreement enforcement," not "law enforcement." Key to *any* FCC matter is this reality, which is the concept to be proved, here: The FCC's "authority," thus any FCC "claim," derives, *if at all*, only from a viable commercial nexus. Said another way, the FCC's "authority" arises, if at all, only after the "target" consents to being regulated.

Conspicuously *absent* from USOA's Complaint, Doc. [1], is any allegation of the existence of the indispensable condition precedent of consent. Conspicuously *present* is USOA's legal argument that they don't ***need*** evidence of consent, Doc [1] p.7 ¶¶ 22-23, which is USOA's judicial confession that they don't ***have*** any evidence of consent. Without evidence of an enforceable commercial nexus, i.e., without evidence of consent, USOA presents no "case or controversy," i.e., no standing. *Defenders of Wildlife,* 504 U.S. at 560-61. (RULE 12(b)(1).)

### A. The analogy to "transportation" matters – semantics and consent.

THE OLENICKS understand that this court has recently addressed and/or is still in process of addressing some quite well-presented "transportation"-dependent matters. Since centralization of communications *and* transportation happen *both* to arise from the Sixth Plank, "6. Centralisation of the means of communication and transport in the hands of the State," < https://www.marxists.org >, and since communism can't work in "United States" any way, at all, *other than* commercially, to understand the commercial mechanism for the one is to

understand the commercial mechanism for the other (and for commercial communism, generally).

"Transportation" enforcement matters turn, ultimately, on whether "vehicle" is proved.  There are four core terms of semantics, i.e., terms of legal conclusion, for "transportation" matters, namely "operate," "drive," "motor vehicle," and "vehicle," and they are algebraically dependent. **"Operates"** depends on either "vehicle," TRANSP. CODE § 541.001(1), or "motor vehicle," TRANSP. CODE §§ 601.002(8), 642.001(2), 647.001(5), 724.001(11). [2]  "[']**Drive**['] means to operate or be in physical control of a motor vehicle." TRANSP. CODE § **522**.003(11) (emphasis added) (Ch. **522** is the *commercial* driving chapter). And, obviously, "**motor vehicle**" depends on "vehicle." TRANSP. CODE ANN. §§ 501.002(17), 502.001(25), 522.003(21), 541.201(11), 601.002(5), 642.001(1), 647.001(4), 683.001(4), 728.001(2). Fundamentally, *everything* about a "transportation" matter depends on "**vehicle**."

To understand what "**vehicle**" means, we study into what "v̲e̲s̲s̲e̲l̲" means, which latter term the Supreme Court (U.S.) construed in *Lozman* (a "no evidence" case).  "V̲e̲s̲s̲e̲l̲" has a deceptively simple definition: (A) used, or (B) capable of being used, for "transportation" (on/in water).  The concept was (and, in this court, obviously still is) that "capable of being used" had to do with physical / mechanical design.  Riviera Beach thought that way, as did both the trial and appellate courts.  But, that's not what "or capable of being used" means.  It's not a physical / mechanical design element.  It's the consent element, which is why

---

[2] Or "aircraft." TRANSP. CODE § 24.013(f)(2).

**No commercial nexus**

governmental units do *not* have unilateral discretion to decide what is and what is not a "vessel." *See Lozman,* Part IV.  Lozman, a U.S. Marine, prevailed because Riviera Beach had no evidence not only of (A) "transportation" (Lozman had never used his floating house to "carry passengers or cargo") but also of **(B) consent** (Lozman never entered the clandestine trust agreement that arises when one "registers" his (water-going) conveyance so as to obtain an "M/V _(name)_"). No evidence of "transportation" use and no evidence of consent meant that there was no "vessel;" hence, no jurisdiction.

        To understand the indispensable nature of consent in the definition of "vessel" is to understand that the Supreme Court (U.S.) is telling us that Riviera Beach confessed itself out of court the instant they filed their case.  How do we *know* that?  It's common in the maritime *in rem* matters to name the "vessel" in the case style, typically with an "M/V _(name)_."  Thus, the Supreme Court, by reciting that trial court case style, which mention is very unusual, draws our attention to it.  The key isn't what's *stated* but rather what's *missing*.  Riviera Beach sued *in rem*, but they sued a *description*, not an "M/V _(name)_."  There's no "M/V _(name)_" *to* sue, because Lozman never "registered" his floating house to *obtain* a formal "M/V _(name)_."  It's in the act of "registering" the (water-going) conveyance that one consents to being regulated per those standards.  In sum, Riviera Beach confessed, in its case style, having "no evidence" of consent.

        What's the difference between a water-going conveyance and a land-going conveyance when it comes to "transportation" enforcement?  Absolutely

**No commercial nexus**

nothing, except the method by which the consent is seduced.  For cars, consent arises from the "Certificate of Title" trust, as addressed more fully in the "transportation"-specific matter(s).

Bottom line, what we see in "transportation" matters is that the semantics exist to hide the consent element.  And, because we're talking consent, we're not talking "law enforcement;" we're talking "agreement management."  To see the indispensable element of consent in "transportation" matters is to see the operational mechanism in Sixth Plank matters, generally (to include "communications" matters), thus in commercial communism, generally. Communism is very much alive and well in "United States," but only because the People have yet to realize that we have 100% control over the spread of that disease, for **_all_** of it is 100% dependent on clandestine "gotcha" "agreements."

B.  **Independently from the fact that "communications" and "transportation" enforcement both implement Sixth Plank policy, how do we _know_ that the FCC has to have, allege, prove up, the condition precedent of consent?**

1.  **Regs don't function by any other legal mechanism.**

The most direct confirmation is already mentioned.  Regs just can't, and therefore don't, function outside the context of commercial consent.  Not that everything produced _legislatively_ is instantly "evidence of law," but **_nothing_** produced _non_-legislatively can ever be "evidence of law."  **_Nothing_** produced _non_-

**No commercial nexus**

legislatively is ever "active" solely because it's in print.  The congress has never delegated its legislative authority.  Thus, where language is created *non-*legislatively, it's active if and only if it's been agreed to.

### 2.  What type of claim may be both "civil" and "quasi-criminal" simultaneously?

"Forfeiture actions, nominally civil, are quasi-criminal in nature." *Any and All Radio*, 204 F.3d at 667; *Rust Communications Group*, 425 F.Supp. at 1032-33.

A civil claim sounds either in tort or in agreement, i.e., contract or trust.  These are three different types of claims.  In an 1886 ruling, the Court addressed whether a municipal corporation (as distinguished from those acting under its name) was liable for taxes for its production and sales of alcohol. The Court fully distinguished the three types of claims via its refreshing respect for proper use of parallelism.

> The truth is that, with the great increase in corporations in very recent times, and in their extension to nearly all the business transactions of life, it has been found necessary to hold them responsible for acts not strictly within their corporate powers, but done in their corporate name, and by corporation officers who were competent to exercise all the corporate powers. When such acts <u>are</u> not founded on **contract**, but <u>are</u> arbitrary exercises of power in the nature of **torts**, **or** <u>are</u> ***quasi* criminal**, the corporation may be held to a pecuniary responsibility for them to the party injured.

*City of Salt Lake City*, 118 U.S. at 260-61.

To make the jurisdictional point, all THE OLENICKS have to show is that the FCC's claim is not a tort claim. Since "punishment" is part of how "quasi-criminal" is distinguished from "civil," some tort claims are mislabeled.

**No commercial nexus**

While tort claims may *piggy-back* "criminal" claims, e.g., "conversion" piggy-backs "theft," and while some of that piggy-backing uses identical labeling, e.g., "assault and battery," "trespass," "fraud," tort claims don't *double* as "quasi-criminal" claims.

> It does not follow that the availability of punitive damages in a given civil action renders it quasi-criminal in nature. Although the line between tort and crime is ambiguous, it does nevertheless exist. Punitive damages obviously constitute punishment, but the underlying acts for which such awards are levied sound in tort, and not under the criminal law. It may safely be said that punitive damage awards punish and deter tortious behavior, while quasi-criminal civil remedies punish and deter criminal behavior.

*Priv. Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 44 F.3d at 1091 n.1 (Heaney, Senior Cir. J., dissenting) (organized crime RICO case).

For another practical perspective regarding the distinction, here's a discussion within the analysis of the Commodity Exchange Act.

> Section 2(a)(1) departs from the common law in two respects. It is in effect a quasi-criminal statute as well as a tort statute, for it can make the principal liable for not only the payment of damages to the victim of the tort (the statutory tort of commodities fraud) but also the payment of a fine to the government.

*Rosenthal & Co.*, 802 F.2d at 966. Thus, the existence of a claim of a "fine" payable to the government applies, here. But, what justifies calling it a "fine?" Why is USOA showing up instead of the FCC? It's all part of the intent to keep the commercial mechanism clandestine.

Thus, in the event there is *any* confusion in distinguishing tort from agreement in *this* fact pattern, let's address the obvious. Plaintiff's requested damages sound in *actual* damages, *not* punitive damages. Just can't get to "quasi-criminal" in a tort context where there are no "punitive damages" asked for.

---

RULE 12 Motions (THE OLENICKS)                                          20
**No commercial nexus**

Bottom line, USOA's (FCC's) claim does not sound in tort.

It seems hollow to leave the rest of the question (is it contract or trust?) unaddressed at this stage, but this is *all* that has to be proved to make the jurisdictional point on which this ***entire*** case turns. For this threshold jurisdictional issue, it just doesn't matter whether we're talking contract or trust, because each depends on a commercial nexus. Thus, by leaving the rest of this issue open in this context, it shows, all the more, that *all* that THE OLENICKS have to show, to demonstrate total and complete lack of (subject matter) jurisdiction, they've already shown. This is a civil matter that doesn't sound in tort.

For this reason, USOA most certainly ***does*** have to have, plead, ***and*** prove the indispensable condition precedent of consent, i.e., that there's a viable commercial nexus between the FCC and THE OLENICKS, or else USOA has no standing, for want of a "case or controversy." Since USOA has already judicially confessed not having any such commercial nexus to prove up, Doc [1] p.7 ¶¶ 22-23, USOA has followed in the footsteps of Riviera Beach confessing itself out of court.

### 3.  <u>Conversely, what type of claim is popularly "criminal" but actually "civil" in nature?</u>

The foregoing is sufficient to confirm lack of jurisdiction. The FCC ***always*** depends on consent, but USOA has ***pled*** that they don't have to *here*, thereby confessing no commercial nexus. While this one is over, that's merely one of the most obvious of the reasons. THE OLENICKS proceed, because there are more

details that show not only this court's total and complete lack of jurisdiction but also that USOA's frivolous and groundless suit exists for an ulterior motive.

What this third point illustrates is that this consent-dependent mechanism isn't limited just to the national-level agencies. It's a *modus operandi* on which the entirety of what we call "government" these days depends. While some commercial nexus dependent matters are treated as "quasi-criminal," others masquerade as full-tilt "criminal" matters. The concept addressed in *Any and All Radio,* 204 F.3d at 667, is that some "quasi-criminal" claims are popularly called "civil." The concept addressed here is along the lines of the converse of that, namely that several "civil" claims masquerade as "criminal" matters. By looking at this distinction between "criminal" and "civil" by asking / answering what *"criminal"* matters are actually *"**civil**"* in nature, we see just exactly how dependent the entire system is on clandestine "agreements." In other words, it's not just these national-level agencies that depend on "agreement management" masquerading as "law enforcement."

Texas is one of only two jurisdictions in the nation, the other being Oklahoma, by which it's directly possible to *prove* that matters popularly treated as "criminal" are, in fact, "civil" in their foundational nature. This is due to the bifurcation of the state's high court into "civil" and "criminal." As might be expected, the evidence is subtle, but it's not so subtle as to escape understanding if one is genuinely interested in coming to terms with the actual consent-dependent mechanism on which the FCC depends.

One item that confirms the "civil" nature of a "criminal" charge is the case STATE OF TEXAS brought against a man named Florance. He was charged with filing a bogus lien, and he appealed his conviction to the Supreme Court of Texas, not the Court of Criminal Appeals.  Why?  Because the charge language wasn't solely Penal Code language; it incorporated a procedure from the Gov't Code.  It's the mere existence of that "administrative procedure" that confirms (A) that the "charge," itself, depends on a commercial nexus, thus (B) that the "charge" is fundamentally "civil" in its nature, i.e., deriving from a commercial nexus.  Florance's case came early in the process of coming to terms with "where" these various commercial nexuses (nexi?) first show up, thus how to avoid them *ab initio*. Because the Supreme Court (Tex.) denied relief, it follows that there *was* a viable commercial nexus, i.e., it wasn't avoided. Florance v. State, No. 09-1028 (Tex. 2009) (**Denied**).  That said, the point is this:  if that matter *were* "criminal," as popularly believed, then the Supreme Court of Texas would have Dismissed the petition for Want of Jurisdiction.  Because the ruling is Denied, *not* DWOJ, the competent conclusion is that the matter *was* "civil" in nature.  Their ruling of Denied *confirmed* that they reached the merits, i.e., that the Court had "civil" jurisdiction.

*That* is a **Penal Code** "charge" confirmed as being ***"civil"*** in nature.  That "administrative procedure" incorporated from the Gov't Code, when not responded to properly, establishes an enforceable commercial nexus.

While **Transp. Code** matters are popularly treated as "criminal," these cases confirm them as being ***"civil"*** in nature:

**No commercial nexus**

- Perkins v. State, No. 15-0594 (Tex. Sept. 25, 2015) ("Perkins I") (**Denied**, not DWOJ);

- Perkins v. State, No. 16-0247 (Tex. May 13, 2016) ("Perkins II") (**Denied**, not DWOJ);

- Stevens v. State, No. 16-0248 (Tex. Jun. 24, 2016) (**Denied**, not DWOJ);

- Perkins v. State, No. 16-0782 (Tex. Jan. 20, 2017) ("Perkins III") (DWOJ) (for want of amount in controversy > $250 – "fine" amount in judgment is $0).

In yet a third example, *all* **"ordinance"**-based claims are *"civil"* in nature, as well. While the Supreme Court of Texas has communicated this perspective before, here's a recent re-confirmation. *See, e.g., City of Laredo*, __ S.W.3d __, 2018 WL 3078112, at *4 n.28 ("civil" jurisdiction over "criminal" ordinances).

In sum, it's subtle, but it's solidly confirmed that all kinds of "civil" matters masquerade as "criminal" matters. This confirms the use of the clandestine commercial nexus technique "everywhere." It's just how it's done.

### WHAT IS THE NATURE OF THE COMMERCIAL NEXUS ON WHICH THE FCC DEPENDS:  CONTRACT OR TRUST?

As for whether the commercial nexus sounds in contract or in trust, it's long established that nothing about contract is subject to "criminal" sanctions of any type.  Breach of contract isn't punishable criminally. TEX. FIN. CODE § 392.301(a) (prohibited debt collection practices); *Brown*, 718 S.W.2d at 680-81 (applying TEX. REV. CIV. STAT. ANN. art. 5069-11.02 (1986)) (charging debtor with theft of the

**No commercial nexus**

collateral (the car) is a prohibited debt collection practice); TEX. PENAL CODE (no crime based on mere breach of contract). *Cf. Bailey* (breach of contract can't be, and wasn't, criminalized). *Accord Berheide*, 421 F.3d at 540 ("[B]reach of contract is not a crime.").

That leaves breach of trust as the *only* possible legal mechanism allowing a "civil" claim also to be characterized as "quasi-criminal." And, it just happens that breach of trust *is* also subject to "criminal" sanctions. *Cf.* TEX. PENAL CODE § 32.43 (commercial bribery) (i.e., criminal breach of trust).

### WHAT IS THE GENERAL RULE THAT TIES ALL THESE SORTS OF MATTERS TOGETHER?

What *type* of "agreement," then, did that Tex. Gov't Code "administrative procedure" tied to the Tex. Penal Code generate? A trust.

What *type* of "agreement" is established by the "Certificate of Title" transaction? A trust.

What *type* of "agreement" is established where an "ordinance" is enforced and a "criminal" sanction is (lawfully) imposed? A trust.

Thus, what *type* of "agreement" is the FCC's condition precedent commercial nexus? A trust.

Commercial communism depends on the law of trust. By this technique, there's the intended systemic "benefit" of the "harem scarem" psychological effect via the *constant* threat of "(quasi-) criminal" charges for "non-compliance."

---

**No commercial nexus**

Given that the Gov't/Penal Code claims, *and* Transp. Code claims, *and* ordinance-based claims are all "civil" in nature but are all marketed as "criminal," is there a common thread, and, if so, what is it?  By deduction, we identify the common thread, which, put concisely, is this:  *all* "(quasi-) criminal" charge language codified outside the jurisdiction's penal code depends on the law of trusts.

Applying that deductively reasoned standard, since the penal code for the relevant jurisdiction, here, namely "United States," is Title 18, and since USOA's claims on behalf of the FCC have nothing to do with Title 18 language, it follows that for anything to be characterized legitimately as "quasi-criminal," such claim depends on the law of trusts.

### IS TITLE 47, AS APPLIED, "CONSTITUTIONAL?"

To assert the jurisdictional point still *another* way, we have this: Is Title 47, as applied, "constitutional?"

Not even close. USOA pooh-poohs the reality, but their magnificently un-informed position changes *nothing* about Title 47 or its associated regs, none of which should ever be mistaken as "evidence of law."  The whole of the language USOA (FCC) is throwing at THE OLENICKS constitutes nothing more than "a proposed trust agreement."  And, THE OLENICKS are *still* declining the offer.

---

**No commercial nexus**

### WHAT ARE THE COMPONENTS OF A VIABLE FCC TRUST?

For there to be a trust, at all, there must be both a beneficiary and a trust *res*. *See* 2A SCOTT & FLATCHER, SCOTT ON TRUSTS §§ 66 (necessity of beneficiary and trust *res*), 74 (necessity of trust *res*), and 112 (necessity of beneficiary). Obviously, for there to be someone to kick around, there also has to be a sucker fiduciary. Thus, when the FCC seduces a sucker into its commercial nexus, the trust would be satisfied this way:

### A.  Fiduciary – the "target(s)."

The party to be charged, i.e., the "target," would be the fiduciary, i.e., the "owner" of the *legal* title to the trust *res*.

### B.  Beneficiary – the FCC.

The FCC, of course, would be the beneficiary.

In a "purely" civil action, it'd be the beneficiary with standing, capacity, etc., as the plaintiff.

By charging these types of matters "criminally," what that means is that the "criminal enforcement authority," USOA, is the nominal plaintiff, thereby "hiding," yet exposing, in just one more way, the nature of the alleged relationship between the FCC and the "target."

### C.  Trust *res* – the <u>frequency</u>.

The tricky part, or maybe the obvious part, is the trust *res*. A trust *res* may, of course, be any lawful property interest. As Stevens, Trustee, explained,

**No commercial nexus**

in exquisite and clear detail at trial and on appeal, *see* No. 15-51150, Fifth Circuit, the property interest that the FCC purports as owned in trust to the benefit of the FCC is the **frequency**, itself.  What does the FCC exist to regulate?  USOA says they regulate "communications," but that's galactically too broad.  They don't regulate highway/road/street signs, Braille, semaphore, lighthouses, body language, billboards, or signing used by the deaf.  They don't regulate typewriters or Toast Masters.  They don't regulate grammar or citation format.  "Communications" is *way* to broad.  **Frequencies** and their use is what the FCC [FFC] regulates.

Further, fiduciaries are rightfully "tagged" when they engage in self-dealing or in unauthorized use of trust property.  So, where someone *is* "tagged" for improper " use … of … a … **frequency** ," what does that shout from the rooftops?  It shouts that the trust *res* **is** the **frequency**, itself.

Addressed another way, since (A) no agency has "authority" independent from the existence of a viable commercial nexus with the "target," (B) "quasi-criminal" claims sound in trust, and (C) in the case of alleged "unlicensed" activity, "the" problem is the allegedly unauthorized " *use* …  of … a … **frequency**," what follows is (D) the **frequency** *is* the trust *res* that is allegedly being improperly managed by the alleged fiduciary.  In such a case, the alleged fiduciary is abusing his/her position by breaching the terms of the trust "agreement" by, on the one hand, having agreed not to use the trust *res*, i.e., the **frequency**, without first obtaining a "license" to do so, and yet, on the other, *using* of the trust *res*, i.e., the **frequency**, without a "license."

---

RULE 12 Motions (THE OLENICKS)                                                      28
**No commercial nexus**

Reflecting on this, we take one more step forward.  To see the elements of the would-be trust relevant to FCC "enforcement" is to see that the **_entirety_** of the FCC's "authority" derives from the recognition that a **frequency** **_may_** be (i.e., **_must_** be, i.e., **_is_**) owned **privately**.  If **frequencies** _couldn't_ be owned **privately**, then that private property owner couldn't _possibly_ put that **frequency** into a _trust_ to the benefit of anyone, including the FCC.

### Example Rule 12 application in context.

To apply this in this immediate context, we see that USOA's argument, that they don't **_need_** evidence of a commercial nexus, is what is popularly described these days as an "epic fail."  USOA (FCC) most certainly **_does_** need evidence of a commercial nexus, and because they're confessing the need to advance their claims by some _other_ means, they're confessing what THE OLENICKS have asserted from the beginning: There is no commercial nexus, here.  Therefore, USOA lacks standing. (Rule 12(b)(1).)

Since USOA has failed to allege any viable condition precedent of consent, USOA has failed to allege, and they can't prove, that there's any trust "agreement" involved, at all.  (Rule 12(b)(6).)  In fact, by saying that they don't **_need_** to prove consent, they've already judicially confessed that they **_can't_** prove consent.  (Rule 12(b)(1).)  Further, USOA hasn't pled, and can't prove, that the FCC is a designated beneficiary (Rule 12(b)(1)), thus hasn't pled and can't prove that the FCC has capacity to sue as an alleged beneficiary (Rules 9, 17), much less that

**No commercial nexus**

THE OLENICKS have the capacity as fiduciaries in which to be sued (RULES 9, 12(b)(2), 17), much *less* any viable commercial nexus from which the FCC would have standing as an alleged beneficiary to complain about *anything* (RULE 12(b)(1)).

And then there's USOA's (FCC's) misguided logic. USOA says that the land/building/tower owner is, necessarily, also the one alleging ownership of the **frequency**. Not unreasonable, perhaps, as a place to start, but there's a huge gap, here, given that the apartment unit in which THE OLENICKS live isn't even in the same *building* as the unit in which the frequency creating electronics are. Thus, there is absolutely, positively no logical *or* legal connection between (A) THE OLENICKS' ownership of the land, (apartment) buildings, *or* tower and (B) the ownership/use of the **frequency**. (RULES 8, 9, 12(b)(1), 12(b)(2), 12(b)(6), 17, 19.)

### HOW DOES THE FCC TRY TO SEDUCE THE "TARGET" INTO A COMMERCIAL NEXUS?

The condition precedent of consent could arise from a variety of potential sources (traps). One is the un-informed or imprudent use of semantics, i.e., terms of legal conclusion. Where "vehicle" is foundational to "transportation" matters, "broadcast" is foundational to "communications" matters. Similarly, "operate," "radio transmitter," "transmission," and "(radio) station" are examples of potential "gotcha" semantics in the "communications" genre. Some terms are just too generic to serve as "gotcha" semantics, but some are specific enough to work.

**No commercial nexus**

As should be obvious to anyone completing even their first semester of law school, the semantics are terms of legal conclusion where they're defined, i.e., that there are elements to be proved in order that the definition be satisfied. Thus, where the "target" self-applies such semantics, USOA (FCC) has a "confession" to use against the "target" rather than an evidentiary burden to prove the elements of each term of semantics.

Because no agency has regulatory authority *without* the "target's" consent, consent isn't left dangling as a mere possibility. Consent is *so* indispensable for agencies that the foundational systemic *design* doesn't leave the matter open solely to un-informed or imprudent use of the semantics by the "target." *All* the agencies are "armed" with ways of seducing their respective "targets" into the necessary commercial nexus. While the methods vary per agency, some, including the FCC, employ procedural traps.

The main trap used by the FCC is the "invitation" to participate in the FCC-sponsored arbitration. Since arbitration is 100% voluntary, *see, e.g., Volt Information Sciences, Inc.,* 489 U.S. at 479, (Arbitration "is a matter of consent, not coercion."), to participate (by recognizing the FCC as the / an arbitrator, by using the proposed "case-style" header) is to consent to arbitration. To consent to FCC-sponsored arbitration is to consent to the whole panoply of FCC regulatory authority, because, who besides a **frequency** owner agrees, or has already agreed, to FCC-sponsored arbitration?

---

**No commercial nexus**

Regarding participation, the flip side is that non-participation, i.e., "silence," is presently viewed as consent. Why is that? Here's an "in a nutshell" version. In the beginning, "silence" meant "no agreement," "no consent." This was part and parcel of the policy inherent in the Common Law, which body of law was brought into each transaction via the use of honest weights and measures, i.e., gold and silver Coin. It took several generations, but the banking interests eventually managed to remove all gold and then all silver from general circulation. What the banking interests provided as the substitute was debt-based "currency" supplemented with scrap metal tokens.

*The* reason for changing from Currency to "currency," from Money to "funny money," *was* to change the foundational choice of law. There are some very foundational changes in the present choice of law with respect to the original Common Law, one of which is the meaning and treatment of "silence." Where "silence" *used* to mean "no agreement," "no consent," it presently means "consent."

*So*, the recipient of this or that item of "correspondence" from an agency can't go silent; s/he *must* "speak," or else s/he risks "consent by silence." However, in that response, one *doesn't* also *have* to consent to arbitration. Thus, where the agency's "correspondence" includes a "case style" as a header, that's the agency's "invitation" to agency-sponsored arbitration. But, a response *sans* that "case style" avoids both "consent by silence" *and* "consent via participation in arbitration."

It's a tight-rope walk that THE OLENICKS have managed *very* successfully. Bottom line, THE OLENICKS haven't self-shishkabobbed. They

**No commercial nexus**

haven't used any of the "gotcha" semantics; they didn't go silent; *and* they never consented to arbitration.  On top of that, from Day One they've demanded proof of a commercial nexus, and the FCC confessed that there was/is no such thing.  In sum, USOA has no commercial nexus to enforce, as they've already confessed in their Complaint.  Doc. [1] p.7 ¶¶ 22-23.

In short, USOA's assertion made in [1] p.7 ¶ 23, is just flat "dead wrong." The FCC's "authority" most certainly *is* limited, **exclusively** in fact, to those situations in which there *is* consent.  The FCC has absolutely, positively no authority, at all, whatsoever, *unless and until* it *has*, and can both plead and prove, a viable commercial nexus with the "target(s)."

Said another way, what [1] p.7 ¶ 23 *confesses*, "judicially," i.e., on the Record in open court, is USOA's total and complete *absence* of any viable commercial nexus.  What USOA judicially *confesses* by pooh-poohing THE OLENICKS' refusal to address the *content* of the "invitation(s)" to arbitrate is that THE OLENICKS have asserted, from Day One, their *non*-consent.

Because USOA contends that they don't *need* such evidence, what they're confessing judicially is that they don't *have* any such evidence.

**No commercial nexus**

### *Relevant 90.1 FM litigation history – this very court already declared who owned 90.1 FM (prior to the Calvary Chapel "take over").*

Why does this litigation history matter?  Because it ends *this* litigation for want of jurisdiction.  The history supports THE OLENICKS' RULE 12(b)(7) defense, which also looks to RULE 19.

Who are the indispensable parties?  The parties already judicially declared by this very court to be the **frequency** owners.

### THE GOVERNING LEGAL PRINCIPLE:  CO-TRUSTEES ARE INDISPENSABLE PARTIES.

The foundational policy supporting THE OLENICKS' RULE 12(b)(7) defense is this: co-trustees are indispensable parties.  *Robertson*; *Pulitzer-Polster*; *Warshaw*; *Hotel Markham, Inc.*

### REVIEW OF THE FOREGOING.

The FCC's "authority" derives, if at all, from a commercial nexus, sounding in trust, where the party to be regulated (A) owns outright, i.e., **privately**, the **frequency** at issue and then (or simultaneously) (B) puts that **frequency** into trust for the benefit of the FCC, so that (C) the FCC may then regulate that sucker fiduciary into the ground (per Sixth Plank policy).

It (still) all comes down to the point identified at the beginning of this motion:  USOA has no evidence of consent, no evidence of any commercial nexus.  Without it, they have no factual basis for asserting that THE OLENICKS have in any way not only asserted ownership of a **frequency** but also put such ownership

**No commercial nexus**

into a trust for the benefit of the FCC.  Since USOA has already confessed not

having evidence of consent, Doc. [1] p.7 ¶¶ 22-23, USOA has confessed itself right

out of court.  But, that's not the *only* confession made on the face of the pleading.

Just as Riviera Beach confessed itself out of court in its case style, so has USOA

confessed itself out of court via its case style.


### FOUNDATIONAL HYPOTHETICAL FOR RULE 12(B)(7).

For purposes of this segment of this discussion, and in ironic contrast to

USOA's confession of having no evidence of consent, let's just dispense with that for

a moment by assuming consent.  There isn't any, in reality, but the point here is

ever so clear where we pretend for a moment that there is.

For clarity, where we presume consent, we presume away 12(b)(1) and

12(b)(2), but not also 12(b)(6) defenses. Failure to include indispensable parties is a

particular type of 12(b)(6) problem.

The fundamental point for RULE 12(b)(7) is simply this.  To comprehend,

even in the slightest, how the FCC's authority arises is to comprehend that for

matters involving 90.1 FM, there already exists a list of co-trustees.  That list was

established **by this very court** at the behest of **the very same ex rel. party**,

namely the FCC, via its Chair.  Since THE OLENICKS weren't/aren't on that list,

to add them, USOA has to have evidence of ownership **plus** evidence of consent to

being regulated.  Without such evidence, USOA can't now be heard to add THE

OLENICKS to that list.

---

**No commercial nexus**

But, for purposes of this RULE 12(b)(7) discussion, let's say that such evidence existed.  To be super-abundantly clear, there is no such evidence, as USOA has judicially confessed.  But, to make this jurisdictional point, even if we were to presume consent, what THE OLENICKS detail here is the **facial *impossibility*** of there *being* **any** jurisdiction in this (or any) court for *this* matter, for want of indispensable parties.

### THE ORIGINAL, JUDICIALLY-DECLARED LIST OF OWNERS DIDN'T INCLUDE THE OLENICKS.

#### A.  The original 90.1 FM NAL matter(s).

*See* No. 1:10-CV-00957-SS (W.D. Tex., Austin) (USOA v. R. Frank), and No. 1:10-CV-00964-SS (W.D. Tex., Austin) (USOA v. Jerry and Deb Stevens).

The long and the short is this. To be "tagged" via an NAL proceeding for "unlicensed" *use* ... of ... a ... **frequency**," is to be "declared", judicially, to be a fiduciary with respect to the ownership of the **frequency**. To the FCC's satisfaction, thus to USOA's satisfaction, that list of owners included three names: Sheriff Frank (Retired), and Jerry and Deb Stevens. That's it. That's all.

To note this early, so as to remember this as we near the end of this history review, *see* D., (Travis County) Sheriff Frank, Retired, owned the land, thus the building (in that case, his house), thus also the tower on which was mounted the antenna by which the 90.1 FM programming was made available to a substantial geographic region encompassing the Austin area.  He was beyond FCC's reach. But, he self-shishkabobbed.  It's very important to see "that" he self-shishkabobbed, thus

"how" he did that.

When LEE  (FCC Houston) sent out the FCC's initial claims to the original 90.1 FM "targets," who *did* own, **privately**, and thus were using, 90.1 FM, the "targets' " initial response(s) was(were) along the order of requesting more time to respond.  Whether or not that, by itself, was problematic, we see in hindsight that they self-shishkabobbed during that "administrative process" (A) by using the "gotcha" semantics of "broadcasting," and maybe one or two additional "gotcha" terms of semantics, (B) by challenging the regs, which challenge boomeranged, subtly suggesting "consent" that FCC regs applied to them, at all, and (C) by "accepting" the "invitation" to FCC-sponsored arbitration, by using the FCC "case style," and etc., in their responses.  Also influencing the final judicial decisions in those original 90.1 FM NAL cases was some prior litigation by which the "targets" also self-shishkabobbed by using the "gotcha" semantics.  In short, they "consented." By words and conduct in their initial administrative responses, both substantively and procedurally, they became the flies accepting the spider's invitation to test out the new webbing. *That's* how the clandestine trickery written into the very fabric of what we call law was used to convert the otherwise fully legitimate, independent ownership and use of 90.1 FM in Austin into the FCC-controlled debacle it became.

On the one hand, if these people *weren't* **owners** of that **frequency**, they couldn't possibly have put that **frequency** into trust for the benefit of the FCC, however unintentionally that happened, much less be held "quasi-criminally" liable for breach of a fiduciary duty regarding *use* of that trust's property, i.e., the

**No commercial nexus**

**frequency**, in the form of "unlicensed" use.  Simultaneously, and on the other, if they *weren't* the **_only_** **owners**, then the trial court lacked subject matter jurisdiction for want of indispensable parties, namely co-trustees. *Robertson*; *Pulitzer-Polster*; *Warshaw*; *Hotel Markham, Inc.*

Thus, at *that* time, **circa 2010**, USOA, acting ex rel. FCC's Chair, was perfectly satisfied that they had "nailed" **_all_** parties responsible, i.e., all trustees over the *res*, 90.1 FM, and for the benefit of the FCC.

### B.   The judicially declared ownership continued right up until the Calvary Chapel "take over."

*See* No. 1:15-CV-00257-SS (W.D. Tex.) (Stevens, Trustee v. Calvary Chapel).  This was at least the third, if not the fourth, judicial proceeding involving ownership, thus use, of 90.1 FM.

Hindsight being 20/20, what turned out to have been the *next* problem by the time Calvary Chapel entered the picture, **circa 2015**, is that the fiduciary obligation to the benefit of the FCC that had been "declared" via the NAL matter was *still active*.  The original NAL litigation hadn't *terminated* that trust but rather served simply to "head slap" the unintentional (thus recalcitrant) "fiduciary(ies)" for not getting a "license."  To terminate that "trust" *completely*, all three judicially declared co-trustees needed to have given Notice of termination to the judicially-recognized beneficiary, i.e., the FCC, which step didn't happen, for whatever reason.  Thus, at the time of the Calvary Chapel "take over," **circa 2015**, Calvary Chapel was a "complying" fiduciary, while the previously declared, **_and_**

---

**No commercial nexus**

***continuing***, fiduciaries weren't. It's the same type of situation as regards property taxes – where the one party isn't paying, the beneficiary "fires" that fiduciary (by appearing to confiscate the property) and "hires" a new one (by appearing to sell the property).  All that really happens is a change in fiduciary; the trust *res* and beneficiary(ies) remain exactly the same.  And, *that's* how/why Calvary Chapel came to own/use 90.1 FM under FCC's supervision of Sixth Plank policy.

### C.   The two sides of the same "absent party" coin.

#### 1.   <u>Were indispensable co-trustees absent in 2010 [?] ...</u>

RULEs 19 and 12(b)(7). To make this point, which is etched in stone via the prior litigation history, as super-abundantly plain as may be possible to make it, the ***judicial*** decisions out of **this very court** in the original (2010) NAL matters "declared" ownership of 90.1 FM in *those* parties Respondent, namely the Stevens (husband and wife), and Sheriff Frank, Retired.  If there *were* more co-trustees, e.g., THE OLENICKS, then this very trial court lacked subject matter jurisdiction over the original (2010) NAL proceedings, for want of indispensable parties. *Robertson*; *Pulitzer-Polster*; *Warshaw*; *Hotel Markham, Inc.*

At no point at any time during any of that litigation, spanning 2009 to 2016, did THE OLENICKS' *names* even get mentioned, much less were they included as parties.  THE OLENICKS have never had any ownership interest in any **<u>frequency</u>**, including **<u>90.1 FM</u>**.  THE OLENICKS have never owned any part of **<u>90.1 FM</u>**, not even **privately**, much less in trust to FCC's benefit. These facts are

---

**No commercial nexus**

self-proved by the rulings in the prior **90.1 FM** litigation.

USOA (FCC) claimed, starting in 2008 or 2009, and this very court confirmed, by suit initiated by USOA ex rel. FCC's Chair at that time, in 2010, that ownership of **90.1 FM** was *not* in the name of THE OLENICKS.  And, given that THE OLENICKS were *not* parties to the subsequent litigation challenging Calvary Chapel's interference with the programming on **90.1 FM**, initiated in 2015, it's child's play to conclude that there simply is no actionable ownership in THE OLENICKS regarding **90.1 FM** (or any *other* **frequency** for that matter), regarding the original (2010) NAL proceedings.

Thus, THE OLENICKS don't see any jurisdictional failure of parties regarding the original (2010) NAL proceedings.


### 2.   **... or are indispensable co-trustees absent now [2018]?**

For all time relevant to this matter, THE OLENICKS owned the land, thus the building(s) and the tower, none of which comes within the ambit or scope of the FCC's mission.  And, to risk the proverbial beating of the dead animal, **this very court** has already declared the owners of **90.1 FM**, which list, to USOA's (FCC's) complete satisfaction *at the time* (2010) **didn't include THE OLENICKS**.

So, as of **2013**, when *this* one started, if there *were* even the *remotest* of indicia of ownership of **90.1 FM** in THE OLENICKS, of which there is none, but even if there were, this court *still* has no jurisdiction, **and** it's an incurable problem.

**No commercial nexus**

### a.   Failure to exhaust "administrative process."

The judicially declared co-trustees from the original (2010) NAL proceedings are not named in this 2013-started matter, and USOA (FCC) has failed to exhaust "administrative process" regarding them.

Each NAL matter is tantamount to a new "transportation"-based "ticket" matter.  The whole of USOA's (FCC's) burden to prove the alleged fiduciary obligation starts anew with each new "ticket" (NAL). Admittedly, as regards "licensees," USOA (FCC) has a turkey shoot, in exactly the same way that for the named parties in "Certificate of Title" trusts, the "transportation" plaintiff has a turkey shoot, when it comes to proving the necessary element of consent. *But*, for the *non*-licensees, where's the consent?  There is none.  And none is even possible where there's no effort to activate FCC-sponsored arbitration, i.e., no effort to activate the FCC-specific "administrative process."  So, for *each* new NAL matter, exactly as with each new "transportation" "ticket," the case starts anew. ***All*** indispensable parties, i.e., co-trustees, have to be included. But, none of the judicially declared co-trustees were included in 2013, and now it's 2018.

By analogy, all alleged co-trustees are simultaneously behind the wheel.  *Cf.* the 2010 NAL matters, where *three* were allegedly behind the wheel together.  USOA (FCC) went to considerable effort to "head slap" the three unintentional co-trustees in the 2010 litigation.  So, what, exactly, ***ended*** their co-trustee-ship?  What exonerates the judicially declared co-trustees from ***this*** 2013-started matter?  Why are the *judicially declared* co-trustees *not* included?  From the

law's point of view, thus from the trial and appellate courts' points of view, such ownership interests *clearly* weren't terminated.  How do we know? Because Stevens, although appearing by a completely different capacity in **2015**, was "tagged" with sanctions, because she was still a judicially declared owner (co-trustee) of **90.1 FM**.

Since it's a stretch to say that the land owner, thus building and tower owner, is *also* the one allegedly claiming ownership to the **frequency**, USOA (FCC) got by with some things in the 2010 NAL litigation.  **Frequency** ownership is *logically* connected with the ownership (*use* is likely better) of the electronics that create the **frequency** emitted from the antenna. Thus, when the FCC identifies an antenna, thus a tower, thus a land/building owner, what has the FCC identified?  Nothing important. Nothing relevant. But, obtaining judicial declarations of co-trustee ownership *is* relevant.

Yet, the parties **judicially declared** to be owners (co-trustees) from the original (2010) NAL proceedings are *not* parties to this suit, the origin of which is 2013, not **2015**, not post-Calvary-Chapel "taker over," but 2013. Moreover, the party(ies) (co-trustee(s)) asserting ownership from 2013 to 2016 are *also not* parties to this suit.  Moreover, and fatal to USOA's (FCC's) position in this 2018 proceeding, not one of those parties may be added at this stage due to USOA's (FCC's) failure to exhaust "administrative process." Where are *any* of the judicially declared co-trustees named in, much less served, with the 2013 NAL ("ticket")?

**No commercial nexus**

Thus, even if we created consent out of the thin air, this court has no subject matter jurisdiction.  Even if it were *possible* to add THE OLENICKS to the list of co-trustees for 90.1 FM, where's the rest of that list? Not one of them was included in the indispensable "administrative process." By its very case style, USOA confesses itself right out of court.

### b.  <u>Statute of limitations.</u>

To be very clear, the parties of focus, here, for limitations purposes, are not THE OLENICKS but rather the *non*-named, *non*-included co-trustees judicially declared as such via the original (2010) NAL proceedings.

If we presume that the limitations period in the U.S. language (five years) prevails over the traditional dependence on the *state* language (four years), then it matters that USOA filed this 2018 NAL matter involving THE OLENICKS within five years of LEE's (FCC Houston) August 12, 2013 study. That's not the timing issue of focus, here. The timing issue of focus looks to the *non*-named, *non*-included parties already judicially declared as co-trustees via the original (2010) NAL proceedings but not named here.

If we go with USOA's theory for this 2018 proceeding, namely that THE OLENICKS are also claiming to be **frequency** owners (as of 2013), then what USOA is saying is that the list of judicially declared co-trustees is to be recognized as expanded by inclusion of THE OLENICKS.  Even if that reflected reality, which it doesn't, but even if it did, and, thus, even if USOA (FCC)

---

**No commercial nexus**

*wanted* to fix the magnificently obvious failure to include indispensable parties, i.e., co-trustees, parties *sought* by USOA (FCC) in 2010, and *judicially declared* per that USOA (FCC) request in 2010, as co-trustees, by bringing ***them*** in *now*, USOA is too late.  Even *if* the "administrative process" associated with the 2013 report by LEE were started *now*, and put on a rocket sled full of fuel, it's too late, even per the U.S. limitations standard.  Nothing USOA can do now will ever satisfy all the Notice requirements for including the very conspicuously absent and judicially declared co-trustees, because the limitations period has now passed.

Thus, even if facts existed that justified adding THE OLENICKS to the list of **frequency** owners, USOA faces an impossible burden.  To "tag" THE OLENICKS with breach of fiduciary duty regarding a/the **frequency** is to allege that THE OLENICKS are *additional* co-trustees, i.e., new to ***the list*** that USOA (FCC) started, formally and judicially, in 2010.  Co-trustees are indispensable parties, *Robertson*; *Pulitzer-Polster*; *Warshaw*; *Hotel Markham, Inc.* Therefore, **as of 2013**, since there already existed a list (which ***didn't*** include THE OLENICKS), for any **2013**-started litigation, ***all*** parties to that list of alleged co-trustees ***must*** be named ***and*** served.  Thus, at *this* stage, i.e., 2018, in the **90.1 FM** litigation, for USOA (FCC) to name solely THE OLENICKS is for USOA (FCC) to confess itself right out of court via its case style.  As proved by the 2015 litigation (the Calvary Chapel "take over" case), ***nothing*** about the fiduciary obligations recognized in 2010 had terminated.  So, ***where*** are the other alleged co-trustees that USOA (FCC) went to so much trouble to "tag" in 2010?? And, it's too late to add them now.

D. **Sheriff Frank succumbed to one or more of the "gotcha" mechanisms. THE OLENICKS haven't.**

This is D. Mentioned in A., just above, is the observation that as the land, building, and tower owner, Sheriff Frank was, for all purposes, in the clear. But, he self-shishkabobbed. He rendered himself *also* a **frequency** owner by one or more of the following "gotchas:" (A) using any of the "gotcha" semantics, e.g., "broadcasting," (B) challenging (the scope of) the regs, thereby subtly suggesting that FCC regs applied, at all, and/or (C) "accepting" the "invitation" to FCC-sponsored arbitration, by using the FCC "case style," and etc., in his response(s) (to LEE, etc.). By any one of these missteps, he stopped being merely the land, building, and tower owner. And, as extremely subtle as following is, THE OLENICKS have very solid confirmation that this distinction matters.

The Supreme Court has already "spoken" to the reality and materiality of the difference between the land/tower owner on the one hand, and the **frequency** owner on the other. The **frequency** owners' Petition for Cert. was filed as No. 12-601, which was docketed Nov. 15, 2012. The Court ruled on Jan. 7, 2013. That's 53 days. The land, building, tower owner's (*Frank*'s) Petition for Cert. was filed as No. 12-671, docketed as of Nov. 20, 2012. The Court ruled on Feb. 19, 2013. That's 91 days. Why the difference, if these were the "same" case? Since Frank was the land, building, tower owner, the Court needed the time to verify that Frank had, in fact, somehow self-shishkabobbed, somehow consented to being regulated as an "owner" of the **frequency**.

---

**No commercial nexus**

FCC has no regulatory "authority" over land, building, or tower owners. Such is beyond the mission (scope of "agreement," "consent") of the FCC. Thus, there simply isn't and can't be any "consent" to being regulated by the FCC for land, building, or tower use matters. And, those who don't consent to being regulated as **frequency** owners aren't subject to FCC "authority," either. They remain land, thus building and tower, owners, which is beyond the FCC's reach.

### *This matter – USOA's (FCC's) judicial confession of "no commercial nexus."*

USOA has to prove up the indispensable condition precedent of a viable commercial nexus. But, instead of evidence, USOA depends on their "did not deny" line of irrebuttable condition-precedent-*presuming* "logic." Doc. [1] p.6 ¶ 17 (cont'd from p.5); p.7 ¶ 22. USOA contends that THE OLENICKS' repeated *refusal* to participate in FCC-sponsored arbitration *justifies* USOA's (FCC's) claim. To USOA, overt non-consent means consent. It's a mind-boggling thing.

In 2013, LEE (FCC Houston) detected the location of an antenna, thus the tower on which that antenna was mounted. But that electronic equipment doesn't address the question of who owns the **frequency**.

FCC traced the tower location to land/building/tower ownership. But land/property records don't address the question of who owns the **frequency**.

As for FCC's futile effort to connect a tower location, i.e., land ownership, with **frequency** ownership, we have this. LEE (FCC Houston) initiated this

investigation in **2013**.  That's right at three years after this very court declared

judicially who the owners of 90.1 FM were.  It's right at two years prior to the

Calvary Chapel "take over."  So, there's alredy, as of 2013, a judicial declaration, out

of this very court, as to who the **frequency** owners were.

Regarding the land, there are two contiguous lots.  Each lot is developed

with a building, and each building consists of multiple apartment units.  In other

words, to give it a common label, as is super-obvious to anyone looking at the land

as developed, THE OLENICKS own an apartment complex.  THE OLENICKS live

in one of the units, but that unit is in the eastern of the two buildings / lots, but the

unit from which came the wires connected to the antenna was in the western of the

two buildings / lots.  Thus, the unit in which the frequency creating electronics

existed is not only not the same unit as that in which THE OLENICKS live but also

not even in the same building, thus not even on the same lot.

Land ownership and **frequency** ownership are two entirely different

things.  Owning the land says absolutely *nothing* about owning the electronics that

create the **frequency**.  Thus, while there's a tenuous, not instantly *un*reasonable,

but tenuous, nonetheless, connection even between (A) **frequency** ownership and

(B) single-family unit land / building / tower ownership, as was the situation with

both Frank and The Stevens, it's a *facially* illogical connection to say that since

THE OLENICKS own the land, thus the building(s) (apartment complex), thus the

tower, that they're *also* asserting ownership of the **frequency**, given that the wires

to the antenna do not emanate from the unit in which THE OLENICKS live (which

---

Rule 12 Motions (THE OLENICKS)                                                      47
**No commercial nexus**

situation would take us to the tenuous presumption purporting to connect land

ownership with **frequency** ownership).   To make *that* connection in the multiple

living unit context, i.e., to say that because there's an active antenna on the

apartment complex property that the land owners are also asserting **frequency**

ownership, where the wires to the antenna are from a unit that isn't even in the

same *building* as the one in which the "targets" live, is to make a leap that's

possible only by riding the cow that jumps over the moon, which is, of course, a

segment from a popular children's fairy tale nursery rhyme.


        That should suffice as background.


RULE 12(b)(1).

This court has no subject matter jurisdiction.


### Rule 8 – collateral estoppel (issue preclusion).

        The doctrines of collateral estoppel and res judicata are also known as
"issue preclusion" and "claim preclusion," respectively. *Migra v. Warren City
Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 77 n. 1, 104 S.Ct. 892, 894 n. 1, 79
L.Ed.2d 56 (1984). We use the terms interchangeably in this opinion. The
rule of issue preclusion, or collateral estoppel, bars relitigation of issues that
were actually litigated and decided in a previous action. *See* Restatement
(Second) of Judgments, Introductory Note to ch. 1 (1982). The terms "claim
preclusion" or "res judicata," on the other hand, are generally used to describe
the effect of a prior judgment on all legal theories and claims that should
have been advanced in connection with a particular cause of action. *Id.*

*Matter of Gober*, 100 F.3d at 1208 (bankruptcy context).

        The issue of ownership of 90.1 FM has already been litigated, and it never

---

RULE 12 Motions (THE OLENICKS)                                                    48
**No commercial nexus**

involved THE OLENICKS. USOA is collaterally estopped from now claiming that THE OLENICKS are owners of 90.1 FM.

What did the original (2010) NAL litigation determine?  The then-existing owners (co-trustees) of 90.1 FM.

Were THE OLENICKS in any way, shape, manner, or form on the list of people that USOA (FCC) "charged" as being **frequency** owners?  No.

Were THE OLENICKS in any way, shape, manner, or form on the list of people that this very court declared to be **frequency** owners?  No.

The ownership issue of the **frequency** 90.1 FM has been litigated to a final judgment, which was appealed and upheld (all the way up the line).

If this issue of ownership of the **frequency** (90.1 FM) *isn't* already decided for all purposes, then we have a general "lack of standing" issue, addressed, *infra*. However, since USOA confesses having "no evidence" of any possible commercial nexus involving THE OLENICKS, there's no competent basis for reopening that already decided issue.

Given that we're obviously not dealing with the exact same parties, it may be good to include this, as well.

As a threshold matter, the Court must consider Texas law on issue preclusion. Under Texas law, Plaintiff must show:

(1) The facts involved were "fully and fairly litigated";

(2) The facts were essential to the prior litigation; and

**(3) The parties were adversaries in the prior litigation.**

**No commercial nexus**

*Bonniwell v. Beech Aircraft Corp.,* 663 S.W.2d 816, 818 (Tex.1984) (citing *Benson v. Wanda Petroleum Corp.,* 468 S.W.2d 361 (Tex.1971) and Restatement (Second) Judgments, § 27 (1982)). To meet the fully and fairly litigated requirement, an issue must be actually litigated. *Van Dyke v. Boswell, O'Toole, Davis & Pickering,* 697 S.W.2d 381, 384 (Tex.1985) (citing *Bonniwell, supra* ) ("Once actually litigated and essential issues are determined, that issue is conclusive **in a subsequent suit between the same parties**").

*In re Limbaugh,* 155 B.R. at 956 (focusing on affect from default judgment)

(emphasis added).

     The Fifth Circuit has set out the following elements for applying issue preclusion, or collateral estoppel:

> Collateral estoppel precludes a party from litigating an issue already raised in an earlier action **between the same parties** only if: (1) the issue at stake is identical to the one involved in the earlier action; (2) the issue was actually litigated in the prior action; and (3) the determination of the issue in the prior action was a necessary part of the judgment in that action.

*Petro–Hunt, L.L.C. v. United States,* 365 F.3d 385, 397 (5th Cir.2004) (footnotes and citation omitted). "Collateral estoppel does not preclude litigation of an issue unless both the facts and the legal standard used to assess them are the same in both proceedings." *Copeland v. Merrill Lynch & Co., Inc.,* 47 F.3d 1415, 1422 (5th Cir.1995) (citation omitted). Issue preclusion may apply even if the claims and the subject matter of the suits differ. *Next Level Commc'ns LP v. DSC Commc'ns Corp.,* 179 F.3d 244, 250 (5th Cir.1999) (citation omitted). In addition, " '[u]nlike claim preclusion, the doctrine of **issue preclusion may not always require complete identity of the parties.**' " *Id.* (alteration in original) (quoting *Meza v. Gen. Battery Corp.,* 908 F.2d 1262, 1273 (5th Cir.1990)).

*Tremont LLC,* 696 F. Supp. 2d at 751 (arbitration award context).

     We could get into a study of "privity" from here,

*[C]f. IFC Interconsult, AG v. Safeguard Int'l Partners, LLC,* 438 F.3d 298, 320 (3d Cir.2006) (holding that a particular defense to garnishment would be

---

**No commercial nexus**

precluded if the party seeking to raise it was in privity with another entity
that had raised the same defense in an earlier arbitration)].]

*Tremont LLC*, 696 F. Supp. 2d 741 at 823 n.124 , *see also State Farm Fire and Cas.*

*Co.* 118 F.3d at 377-78 (privity between heirs and party convicted), to show,

somewhat ironically for this defense in this context, that there simply is no

"privity," *but*, then, that's the entire point.  THE OLENICKS *are not* parties to

*any* of the prior 90.1 FM litigation.  That non-inclusion produces one of two legal

results right quick: either the prior litigation (A) included all co-trustees, i.e., all

indispensable parties, or (B) didn't so include all co-trustees.  If it *didn't*, then this

very court never had subject matter jurisdiction.  If it *did*, then why are we here?

The ownership issue is already decided, and it in no way involves THE OLENICKS.

By saying that they have no evidence of consent by THE OLENICKS,

USOA is saying that there's no reason even to *think* about reconsidering the finality

of the 2010 litigation.  Therefore, the issue of ownership of the **frequency**, 90.1 FM,

has already been determined, under full-tilt adversarial conditions.

THE OLENICKS weren't owners then; they're not owners now, so, what in

the world are we doing here (other than venting someone's political spleen to attack

a party for his radio and television programming, which just happened to be

included in the 90.1 FM programming)?  There is zero competent, legal reason to be

here. FCC has no **frequency** ownership issue to dispute.  THE OLENICKS own the

land, thus the buildings and the (antenna) tower.  No one has ever said, and is not

heard to say, that THE OLENICKS have an ownership interest in the **frequency**.

---

**No commercial nexus**

The issue of **frequency** ownership has already been decided, by this very court, by trial. The list of owners of 90.1 FM does not now and has never included THE OLENICKS. So, for what possible legit reason what this matter filed, at all?

### Rule 8 – res judicata (claim preclusion).

"The res judicata effect of a prior judgment is a question of law that a reviewing court analyzes *de novo.*" *Test Masters Educ. Servs. v. Singh*, 428 F.3d 559, 571 (5th Cir. 2005). The rule is comprised of two distinct but related doctrines: (1) true *res judicata* (or claim preclusion)[8] and (2) collateral estoppel (or issue preclusion). *Id.* The relevant doctrine here is true *res judicata* or claim preclusion. Claim preclusion bars the litigation of claims that have been or should have been raised in an earlier suit. *Petro–Hunt L.L.C. v. United States*, 365 F.3d 385, 395 (5th Cir. 2004).[9] Under federal common law:

> [t]he test for res judicata has four elements: **(1) the parties are identical or in privity;** (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) the prior action was concluded by a final judgment on the merits; and (4) the same claim or cause of action was involved in both actions.

*Test Masters*, 428 F.3d at 571. This court uses a transactional test to determine whether two suits involve the same cause of action, asking whether the facts in the two suits are "related in time, space, origin, or motivation, whether they form a convenient trial unit," *id.* in short, whether they are **based on the "same nucleus of operative facts."** *N.Y. Life Ins. Co. v. Gillispie*, 203 F.3d 384, 387 (5th Cir. 2000).

*Snow Ingredients, Inc.*, 833 F.3d at 521 (emphasis added).

As for "same nucleus of operative facts," that's nailed, here, in spades, for which reason, this is going to sound a lot like the immediately discussion. We move from "issues" to "claims."

USOA's (FCC's) *claim* regarding ownership of 90.1 FM has already been litigated, and it never involved THE OLENICKS.

---

**No commercial nexus**

What did the original NAL litigation determine?  The then-existing owners (fiduciaries, co-trustees, indispensable parties) of 90.1 FM.

Were THE OLENICKS in any way, shape, manner, or form on the list of people that USOA (FCC) "claimed" to be **frequency** owners?  No.

Were THE OLENICKS in any way, shape, manner, or form on the list of people that this very court declared to be **frequency** owners?  No.

Does USOA have even one *shred* of evidence to justify a "claim," starting effective 2013, that THE OLENICKS are **frequency** owners?  Even one shred of evidence that THE OLENICKS have consented to being regulated by the FCC?  No.

*Res judicata* is the *claim* preclusion side of the estoppel analysis.  Issue preclusion asks whether the matter was actually litigated. *Claim* preclusion asks whether it *should* have been litigated. This takes us instantly to the RULE 12(b)(7) and RULE 19 matter of indispensable parties. And, obviously, *if* USOA (FCC) *ever* had a claim against THE OLENICKS arising from alleged **frequency** ownership, they absolutely had to have raised it. Why? Because FCC "targets" are charged in their fiduciary capacities, i.e., as trustees, which parties are indispensable parties.

Thus, key to the *claim* preclusion side is this: USOA (FCC) *didn't* raise any **frequency** ownership claim against THE OLENICKS until **2013**, a few years *after* this very court formally declared the owners of 90.1 FM, which list *does not* include THE OLENICKS.

Since the *claims* regarding ownership of 90.1 FM in Austin should have

been raised originally, given that co-trustees are indispensable parties, and given that all such ownership *claims* were decided, finally, in the Supreme Court, as of Feb. 19, 2013, for the FCC to assert "new" ownership claims regarding **frequency ownership**, Doc. [1] p.4 ¶ 14, without even the remotest of intent to produce evidence that THE OLENICKS have asserted, in any way, any *remote* ownership interest in a/the **frequency**, is ***outrageous***, generally.  It's all the more ***outrageous*** given USOA's judicial confession of having not one shred of evidence of consent and yet the contention that such just doesn't matter, here. Doc. [1] p.7 ¶¶ 22-23.  In other words, they weren't even *looking* for new evidence regarding **frequency** ownership so as to ***have*** a claim new (as of 2013) not already raised in the original (2010) litigation.

USOA is judicially confessing that the issue has already been decided. It didn't involve THE OLENICKS before, and it doesn't involve them now. It was a non-issue before, and it's a non-issue now.

USOA is judicially confessing that the claim has already been decided. It didn't involve THE OLENICKS  before, and it doesn't involve them now. It was a non-claim before, and it's a non-claim now.

USOA's having not even *pled* an intention of showing change in ownership, they all the more confess that they have no different claim to assert now than they asserted in the 2010 litigation.  USOA didn't have any claim against THE OLENICKS then, and they have confessed having no claim against them now.  But, whatever "claim" USOA thought it ever may have had against THE OLENICKS it

---

RULE 12 Motions (THE OLENICKS)                                    54
**No commercial nexus**

waived by not asserting it the first time around.  Land ownership in no possible way

infers or implies **frequency** ownership.  Ownership (actually *use*) of **frequency**

creating electronics stands a lot better chance of being a competent connection.

### Rule 8 – statute of frauds.

For there to be a trust, there must be a writing. TEX. PROP. CODE ANN.

§ 112.004. USOA has pled no such signed writing and has tendered not such signed

writing that memorializes THE OLENICKS' intent not only to *own* a **frequency**

but also then to put that **frequency** into trust for FCC's benefit.

### No Standing – No commercial nexus.

*Defenders of Wildlife,* 504 U.S. at 560-61.

Does USOA have even one *shred* of evidence that THE OLENICKS are

**frequency** owners?  Even one shred of evidence that they've consented to being

regulated by the FCC?  No.

As land, building, and tower owners, they are not subject to FCC

"authority."  USOA has pled no "case or controversy," and no facts that give USOA

standing.  Therefore, this court lacks subject matter jurisdiction.

He who claims trust must ***prove*** trust. BOGERT § 50 1st ¶ ("The burden of

proof is on the party who asserts the existence of a trust.").

> A beneficiary seeking to obtain relief for a breach of trust must plead and
> prove ***facts*** which show the existence of a fiduciary duty and the failure of
> the trustee to perform it, and that consequently the court should grant the
> requested remedy.

**No commercial nexus**

BOGERT § 871 1st ¶ (emphasis added). ***Facts***, not semantics. *Cf. Twombly*
(abrogating *Conley*) and *Iqbal,* 556 U.S. at 677–80 (applying *Twombly*).

In the event state law applies for this aspect of this issue, in *Nolana Dev.
Ass'n*, Nolana alleged that Corsi had breached a fiduciary duty. The Supreme Court
of Texas burdened Nolana with proving the trust, the existence of a fiduciary duty
in Corsi, and breach.

> We are without proof of the trust or duties; therefore, we cannot hold
> under the facts of this case that there has been a breach of fiduciary duty
> under an express trust theory.

*Nolana Dev. Ass'n*, 682 S.W.2d at 249-50.

Consent cannot be compelled, as is reconfirmed in each of the following:
*Lozman* (floating house owner could not be compelled to consent to being regulated
per "transportation" standards, i.e., couldn't be compelled to be a fiduciary); *Horne*
(USDA can't compel consent to what amounts to out-and-out theft of
(CALIFORNIA) raisins)); *NFIB* (neither individuals nor STATEs may be compelled
to participate in "obama-care"); *Heller* (consent cannot be compelled via ordinance to
be disarmed, i.e., to waive right of self-defense, in one's own home); *Burger King*,
471 U.S. at 486 (jurisdiction doesn't flow from fraud, undue influence, or
overwhelming bargaining power); FED. R. CIV. P. 8(c) (defenses); TEX. R. CIV. P. 94
(defenses); *Ballard* (local rules don't justify (criminal) Due Process violations);
§ 636(a), (c) ("by consent only"); *Gonzalez* ("If the parties consent").

*Compelled* consent is the exact *antithesis* of the very soul of "the State." The

**No commercial nexus**

coercive environment vitiates the very "evidence" it purports to create. *Ohralik* (addressing coercion specifically engaged by the legal profession); *Bates* (addressing coercion specifically engaged by the legal profession); *Miranda v. Arizona* (coerced confession is not evidence); *Escobedo* (same); *Felter* (recognizing a statutory right to be free from compelled consent regarding an agreement); 1 PAGE §§ 5.7, 15.11 (coerced will is not evidence); BOGERT § 42 at 434, § 44 at 452 and n.16 (coerced trust is not evidence); *Pollock I*, 157 U.S. at 553-54 (1ˢᵗ ¶ of opinion) (non-consent by even one beneficiary prevents amendment to trust agreement) (*see also Pollock II* (expands upon the original ruling, reiterates the "direct tax" concept, vacates the original ruling, reverses the ruling(s) below, and remands with instructions to grant the relief that the Plaintiff had requested)); *Arnold* (vacated per *Booker*) ("evidence" (and never-before-heard-of ***charges***) not presented at trial and not agreed to at sentencing is (are) inadmissible for sentencing); *Lozman* (at the heart of Part IV is the response to the communists among us who want a municipality or STATE agency to have authority to compel their political targets to consent to being regulated – "transportation" is "subjective" in that only the political target may say, by his conduct or his commercial consent, whether s/he's consenting to being regulated; i.e., the target has the "right (not) to contract" and the "right (not) to exercise a privilege," etc.).

Given USOA's judicial confession of no consent, to conclude that consent exists, anyway, is to operate via an irrebuttable presumption. While some irrebuttable presumptions do exist, *see, e.g., Minnick*, 498 U.S. at 156 (Scalia, J, and

Rehnquist, C.J. Dissent) (characterizing "no further contact" rule as an irrebuttable presumption), none appears in support of jurisdiction, and all are suspect, generally. *Galioto* (involuntary mental health patient irrebuttably presumed ineligible to own firearm – Congress removed irrebuttable presumption after S.Ct. noted probable jurisdiction); *Elkins* (Univ. of Md.'s irrebuttable presumption, that G-4 visa status prohibits Md. domiciliary status, certified to state's high court); *see also Toll* (striking irrebuttable presumption that G-4 visa holder can't be Md. domiciliary); *Salfi* (balancing of *Vlandis*); *Cleveland Bd. of Educ.* (striking irrebuttable presumption that pregnant school teachers were physically unfit); *Vlandis* (striking once-and-for-all-time irrebuttable determination regarding in-state tuition eligibility); *Stanley* (striking irrebuttable preemption that unwed father is unqualified to raise his child).

Since USOA has no evidence of *any* trust, much less one in which THE OLENICKS are the fiduciaries and the FCC is the beneficiary, even less one into which THE OLENICKS have placed a **frequency** they own into trust as the trust *res*, even *less* one into which THE OLENICKS have placed an ownership interest in 90.1 FM into trust for the benefit of the FCC, USOA has failed to plead a "case or controversy," much less standing. This court lacks subject matter jurisdiction.


RULE 12(b)(2).

This court has no personal jurisdiction.

In general, the challenge to not being liable in the capacity charged has to be

**No commercial nexus**

done early, ideally "first."  *Accord, Swaim.  See also Humes-Pollett.*

As detailed, above, to be an FCC "target" is to be alleged to be acting in a fiduciary capacity.  USOA has no evidence of any commercial nexus between the FCC and THE OLENICKS.  So, this "lack of capacity" defense works two (both) ways.  THE OLENICKS are not liable in a fiduciary capacity, and the FCC has no capacity to raise a question sounding in trust, for they have no capacity as a beneficiary.

### *Rules 9 and 17 – capacity.*

Both RULE 9 and RULE 17 address objections to capacity.  As USOA confesses, there is no commercial nexus.  Therefore, USOA confesses that THE OLENICKS are not liable in the fiduciary capacity, and FCC has no claim in the capacity of a beneficiary.

### RULE 12(b)(6).

USOA not only has failed to plead a case for which relief may be granted but also has confessed itself right out of court.

To have a claim, USOA (FCC) has to have evidence of consent, but USOA has confessed in its opening pleading that it has no evidence of consent (because, as USOA contends, it doesn't need any).  For want of even an allegation of consent, USOA has utterly failed even to state a claim for which relief may be granted.  USOA points to no signed writing by which the remotest of suggestion of a trust

---

agreement, to the benefit of the FCC, involving a trust res of a **frequency**, specifically 90.1 FM.  Thus, USOA asserts no claim for which relief may be granted.

Moreover, to have a claim against co-trustees, *all* of them must be named and served.  Since USOA went to such dedicated lengths to "nail" The Stevens and Sheriff Frank with the "benefits" of **frequency** ownership under Sixth Plank policy, and since nothing about those judicially declared obligations *ended* until the FCC awarded 90.1 FM to Calvary Chapel, which was in **2015**, it follows that any claim associated with 2013, as this one is, necessarily involves the judicially declared co-trustees from the prior litigation.  But, they are nowhere mentioned.  Thus, in this additional way, as confirmed by the very case style itself, USOA has failed to state a claim for which relief may be granted.


RULE 12(b)(7).

What this defense "covers" is the errant perspectives of either (A) that USOA has no burden to prove consent or (B) that USOA has such evidence, despite its confession to the contrary.  Given the nature of any FCC "claim," anyone "tagged" with liability has been judicially declared to be a trustee.  It just happens that with the 90.1 FM litigation, *three* were so declared.  That's from at least **2009**, and perhaps 2008, with the original NAL litigation commencing in **2010**.  That judicially (recognized and) declared line of fiduciary duty didn't *end* until **2015**, which is when Calvary Chapel "took over" programming on 90.1 FM, having been cleared regarding the **frequency**'s *use* by the FCC.  Thus, as of **2013**, right there in the big

**No commercial nexus**

fat middle of that time period, *if* THE OLNICKS *were* to be included as responsible parties, they were to be included as co-trustees, along with those already declared to be co-trustees *by this very court*.

So, if we take USOA's general proposition, which is unsupported by facts but only legal conclusions, i.e., semantics, as true, then they're alleging that THE OLENICKS owe the FCC a fiduciary duty regarding the ownership, in trust, of the **frequency**. If that *were* true, then THE OLENICKS would be just two more names to add to the already extant list of owners already judicially declared as such by this very court via the original 2010 litigation.

Continuing, then, along the presumption of validity in USOA's assertions of legal conclusions, what USOA confesses by its case style is that this court has no subject matter jurisdiction for want of failure to include indispensable parties, namely, the judicially declared co-trustees from the 2010 litigation.

Down that very road, this one is incurable.  FCC included none of the 2010-declared co-trustees in any of the "administrative process," which means that none of the 2010-declared co-trustees are subject to inclusion in this suit for want of "administrative process."  On top of that, since this is a 2013-started matter, even if USOA (FCC) *wanted* to correct this glaring oversight in indispensable parties, it's just too late.  The five-year plan on which the FCC has operated, here, expired within a couple of days after the filing of this frivolous and groundless suit. Nothing that USOA (FCC) does from the point forward, with all their horses and all their men, can put Humpty Dumpty together again.

**No commercial nexus**

<u>In conclusion, here are the relevant, superior, operating, uncontested facts.</u>

THE OLENICKS own the land, thus the building and (antenna) tower.  For all time relevant to USOA's suit, and even for all time of the FCC's *existence*, the FCC's mission (scope) hasn't included and doesn't include land, buildings, *or* towers.

What the FCC exists to regulate are **frequencies**, not "communications," but **frequencies**.  The **frequency** at issue is 90.1 FM in the Austin area.  While the matter at bar originated in **2013**, the 90.1 FM *litigation* started years before that, *see* No. 1:09-CV-918-SS, which suit was in response to the FCC investigation activity near that time, whether 2008 or 2009.  The open debate over ownership and use of 90.1 FM commenced in earnest via the original NAL suit(s) filed in 2010, which ownership/use dispute continued until at least August, **2016**. *See* No. 15-51150, Stevens, Trustee v. Calvary Chapel, Fifth Circuit.

At *no* time in this entire history of the 90.1 FM litigation did *any* party to that ownership/use litigation *ever* even *remotely* assert that THE OLENICKS had even one iota of a shred of ownership in or use of *any* **frequency** in *any* spectrum, including 90.1 FM.  Key, in 2011, this very court *judicially* determined (declared) the ownership, which didn't include THE OLENICKS. *See* Nos. 1:10-CV-00957-SS (R. Frank), 1:10-CV-00964-SS (The Stevens) (W.D. Tex.).  At that time, Sheriff Frank was the land, building, and tower owner, who ended up self-shishkabobbing.  Since Sheriff Frank's family wasn't enthused by the judicial developments, the antenna needed a new home. The fact that THE OLENICKS's rented out an apartment (tower "space" was included) to a party who owned and managed the

**No commercial nexus**

frequency creating electronics attached to the antenna changed absolutely *nothing* about **frequency** ownership, as was already judicially declared.

Moreover, given USOA's theme of pooh-poohing THE OLENICKS's assertion of USOA's burden to prove a commercial nexus, and given USOA's boldly stated legal argument that they don't ***need*** to prove consent, Doc. [1] p.7 ¶¶ 22-23, what USOA has confessed *in their pleading* is that they don't ***have*** any evidence of consent, i.e., any evidence of any commercial nexus tying THE OLENICKS to any ownership of *any* **frequency**, especially including 90.1 FM.

What USOA argues is that THE OLENICKS are liable, because they didn't deny anything asserted by the FCC.  But, this position self-presumes its own relevance. It also confesses that THE OLENICKS have challenged the very existence of any viable commercial nexus from the very beginning.  Moreover, for THE OLENICKS to engage the merits is for THE OLENICKS to "consent" to FCC-sponsored arbitration, thus, ultimately, to "consent" to being regulated, generally. Who besides owners of **frequencies** held in trust for the benefit of FCC would ever in a million years *have* to respond to the *content* of an FCC-sponsored arbitration? THE OLENICKS preferred, instead, to stop at the threshold and demand proof of a commercial nexus.  Since THE OLENICKS never participated in any FCC-sponsored arbitration, responding (thereby avoiding the risk of having any "silence" be read as "consent") to FCC's correspondence with correspondence of their own, USOA, via the FCC, has never established ***any*** commercial nexus between THE OLENICKS and the FCC.  All that USOA *has* proved is its commitment to harass,

**No commercial nexus**

intimidate, and/or retaliate against THE OLENICKS for their assertions of their respective rights, including their right not to contract / agree / consent.

In the same way that Riviera Beach pled itself right out of court, *Lozman*, USOA has pled itself right out of court.

### Request for Relief

By means of this motion, THE OLENICKS request as follows:

A.  That this court dismiss USOA's claim for want of subject matter jurisdiction, for want of personal jurisdiction, for failure to state a claim on which relief may be granted, and/or for failure to include indispensable parties.

B.  That if it's necessary for this court to look beyond USOA's pleadings to confirm the absence of jurisdiction, that the court give some form of Notice in order that THE OLENICKS supplement this motion with specific references to documents outside the pleadings in support of what would then be treated as a summary judgment motion.

C.  That they be afforded costs.

D.  That they be awarded any and all other relief, at law, in equity, or sui generis to which they may show themselves justly entitled.

Respectfully submitted,

/s/ Walt Olenick
WALTER OLENICK
P.O. Box 7486
Austin, Texas  78713

/s/  M. Rae Nadler-Olenick
M. RAE NADLER-OLENICK
P.O. Box 7486
Austin, Texas  78713

**No commercial nexus**

## § 1746 Declaration – WALTER OLENICK

Per 28 U.S.C. § 1746, and under the laws of perjury of the United States, I, WALTER OLENICK, depose and declare (or certify, verify or state), that I am at least 21 years of age, in fact, I am more than 65 years of age, that I am competent to make this Affidavit / Declaration, that I have personal knowledge of these facts, and that these facts are true and correct.

The facts asserted in this motion are true and correct.

My wife and I own the land, consisting of two adjacent lots, both developed with apartment buildings, on which stands the tower used by those who owned 90.1 FM to put their antenna.

Neither one of us has ever consented to being regulated by the FCC for any purpose.

Neither one of us has ever asserted a private ownership interest in 90.1 FM or in any other frequency for that matter.

Further, Declarant sayeth not.

Executed on this the 12th day of September, 2018

/s/ Walt Olenick
WALTER OLENICK, Declarant

## § 1746 Declaration – M. RAE NADLER-OLENICK

Per 28 U.S.C. § 1746, and under the laws of perjury of the United States, I, M. RAE NADLER-OLENICK, depose and declare (or certify, verify or state), that I am at least 21 years of age, in fact, I am more than 65 years of age, that I am competent to make this Affidavit / Declaration, that I have personal knowledge of these facts, and that these facts are true and correct.

The facts asserted in this motion are true and correct.

My husband and I own the land, consisting of two adjacent lots, both developed with apartment buildings, on which stands the tower used by those who owned 90.1 FM to put their antenna.

**No commercial nexus**

Neither one of us has ever consented to being regulated by the FCC for any purpose.

Neither one of us has ever asserted a private ownership interest in 90.1 FM or in any other frequency for that matter.

Further, Declarant sayeth not.

Executed on this the 12th day of September, 2018

/s/ M. Rae Nadler-Olenick
M. RAE NADLER-OLENICK,
Declarant

# CERTIFICATE OF SERVICE

By my signature below, I certify that on this the __13th__ day of September, 2018, I have served a true and correct copy of this motion on the following by Priority Mail and have delivered the original and one copy to the court:

GARY W. WRIGHT
Assistant United States Attorney
601 N.W. Loop 410, Suite 600
San Antonio, Texas 78216

/s/ M. Rae Nadler-Olenick
M. RAE NADLER-OLENICK,
Declarant

**No commercial nexus**